IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHELBY KRAMER,

              *Plaintiff,*

    v.

FRANKLIN COVEY CO,

              *Defendant.*

Civil Action No. 2:18-cv-1599

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, District Judge

       Defendant, Franklin Covey Co., filed its Motion for Summary Judgment (ECF No. 34), together with an accompanying Brief in Support (ECF No. 35), requesting that the Court grant summary judgment against Plaintiff, Shelby Kramer, on all counts. After consideration of the parties' pleadings and their positions at oral argument, the Court grants in part and denies in part Defendant's Motion for Summary Judgment (ECF No. 34).

I.      **FACTUAL BACKGROUND**

Defendant is an organizational improvement company.  Defendant's clients often engage it to improve several aspects of their operational schemes, including improving the effectiveness of employees, leadership capabilities, execution of strategy, and overall company culture. Defendant employed Plaintiff, Shelby Kramer, from 2007 to 2014 as an Associate Client Partner (ECF No. 36, ¶¶ 1–2); (ECF No. 43, ¶¶ 1–2).  Client Partners are commission-based and usually earned commissions of 8% on account revenue generated and could earn up to 12% if they achieved all quarterly bonuses.  (ECF No. 45, ¶ 64); (ECF No. 52, ¶ 64).    Plaintiff gave birth to her first child while employed by Defendant.[1]  In 2014, Plaintiff resigned from her employment with Defendant to pursue employment with SkillSoft.  (ECF No. 36, ¶¶ 3–4); (ECF No. 43; ¶¶ 3–4).

In 2015, Defendant rehired Plaintiff as a Sales Manager for its northeast region.  Her duties as a Sales Manager included managing a group of Associate Client Partners, coaching and teaching them, holding them accountable to sales goals, attending client visits, and creating strategy for penetrating accounts.  Plaintiff's supervisor at the time was General Manager Elise Roma ("GM Roma").  That same year, Defendant consolidated its sales regions, and Plaintiff's title transitioned from Sales Manager to Managing Director.  (ECF No. 36, ¶¶ 6–10); (ECF No. 43, ¶¶ 6–10).  As a Managing Director, Plaintiff had a total target annual compensation of $240,000.  (ECF No. 46-18, p. 2); (ECF No. 52, ¶ 65).  At the same time, Defendant appointed General Manager Mark Josie ("GM Josie") as a new supervisor for Plaintiff.  (ECF No. 36, ¶ 9); (ECF No. 43, ¶ 9).

---

[1] Defendant did not discriminate against her on account of her pregnancy, nor did it retaliate against her for taking leave under the Family Medical Leave Act ("FMLA").  (ECF No. 36, ¶ 3); (ECF No. 43, ¶ 3).

Plaintiff was generally known as a diligent worker and strong performer who routinely fulfilled her job responsibilities in a satisfactory manner. (ECF No. 45, ¶ 6); (ECF No. 52, ¶ 6). Plaintiff did not have performance issues, and her superiors believed her to be a hard worker and a good manager. (ECF No. 45, ¶¶ 6, 8, 50–53); (ECF No. 52, ¶¶ 6, 8, 50–53). GM Josie told Plaintiff that he planned to expand Plaintiff's team to include twelve to thirteen Client Partners. (ECF No. 45, ¶ 9); (ECF No. 52, ¶ 9).

In October of 2016, Plaintiff informed GM Josie that she was pregnant and planned to take an eight-week maternity leave beginning in April of 2017.[2] (ECF No. 37-1, p. 14); (ECF No. 52, ¶ 10). According to Plaintiff, GM Josie's treatment of her changed after she revealed her pregnancy and planned leave. (ECF No. 45, ¶ 11); (ECF No. 52, ¶ 11). She claims that the following events and circumstances adversely affected her employment: (1) GM Josie began to generally ignore Plaintiff after revealing her pregnancy, and specifically, he ignored emails, requests to join meetings remotely, and stopped having scheduled meetings with her to discuss her team[3] (ECF No. 45, ¶ 12); (ECF No. 52, ¶ 12); (2) although GM Josie previously promised to "scramble" the Client Partner teams (i.e., put seasoned Client Partners on each Managing

---

[2] Defendant's Response to Plaintiff's Concise Statement of Additional Material Facts provides that Defendant "does not dispute that [Plaintiff], at some point, informed [GM] Josie that she was pregnant. However, the exhibit that Plaintiff cites in support of this statement . . . does not support the assertion that [Plaintiff] did so on October 10, 2016." (ECF No. 52, ¶ 10). While the Court was unable to locate an exact date as to when Plaintiff notified GM Josie that she was pregnant, Plaintiff testified that she had notified him sometime in October of 2016.

[3] Defendant disputes that GM Josie was routinely cancelling meetings with Plaintiff on the grounds that "Plaintiff could only identify one 'one-on-one' that [GM] Josie postponed" (ECF No. 52, ¶ 12), and that there is only one circumstance wherein GM Josie ignored Plaintiff's request to join a meeting remotely (ECF No. 52, ¶ 12). Plaintiff's testimony was given in response to questioning by defense counsel, and she was not asked to identify additional instances of cancelled meetings. She also stated unambiguously that "the one-on-ones always occurred, and all of a sudden they were not happening and [GM Josie] was cancelling them or he was too busy to have them with me." (ECF No. 46-2, p. 15).

Director's team) to give each team a fair chance to produce revenue, GM Josie "scrambled" all teams except for Plaintiff's (ECF No. 37-1, p. 14); (ECF No. 45, ¶ 13); (ECF No. 52, ¶ 13); (3) although the company's operating guidelines prohibited doing so, GM Josie permitted other teams to take account targets from Client Partners on her team (ECF No. 45, ¶ 15); (ECF No. 52, ¶ 15); (4) GM Josie did not provide Plaintiff's team with gift cards for achieving substantial growth in the prior fiscal year, despite awarding other teams gift cards (ECF No. 45, ¶ 17); (ECF No. 52, ¶ 17); and (5) GM Josie cancelled hiring on Plaintiff's team because he believed it would not be a good idea to hire employees shortly before Plaintiff began her leave (ECF No. 53-3, pp. 3–6); (ECF No. 52, ¶ 18).

Some of these circumstances prompted Plaintiff to have phone discussions with Chief People Officer, Todd Davis ("CPO Davis"). During Plaintiff's first conversation with CPO Davis, she complained of GM Josie allowing other teams to take accounts and alleged that there was "favoritism" at play. (ECF No. 45, ¶ 16); (ECF No. 52, ¶ 16). In Plaintiff's second conversation with CPO Davis, she told CPO Davis that she was not comfortable with GM Josie's cancelling of the hiring on her team because of her pregnancy. (ECF No. 45, ¶ 22); (ECF No. 52, ¶ 22). During the same conversation, Plaintiff also informed CPO Davis of the instance in which GM Josie refused to provide her team with gift cards, and she further noted that she was "getting scared" because GM Josie "was starting to ignore [her] emails and cancel [her] one-on-ones."[4] (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90). Neither GM Josie nor Executive Vice President of Global Sales

---

[4] Plaintiff testified that CPO Davis specifically stated in reply to the hiring freeze that the company had a right to protect itself from her pregnancy. (ECF No. 46-1, p. 10); (ECF No. 46-2, p. 25). CPO Davis, however, testified that "those were never the words that [he] used." (ECF No. 46-1, p. 24).

and Delivery, Paul Walker ("EVP Walker") were informed of these discussions.  (ECF No. 37-2, p. 6); (ECF No. 36, ¶¶ 91, 93); (ECF No. 43, ¶¶ 91, 93).

Around the same time that Plaintiff disclosed her pregnancy, Defendant began introducing a subscription-based product labeled "All Access Pass," which allowed clients to obtain subscriptions to all of Defendant's content and solutions simultaneously.  (ECF No.36, ¶ 11); (ECF No. 43 ¶ 11).  Defendant began transitioning its business model to accommodate changes in its business strategy, including implementing changes in its hiring practices to suit different methods of selling.  (ECF No. 36, ¶ 12); (ECF No. 43, ¶ 12).  The new business model would include the use of more experienced senior sales employees, while the prior model generally utilized junior sales employees.  (ECF No. 36, ¶¶ 13–14); (ECF No. 43, ¶¶ 13–14).  The restructuring was planned and discussed by top-level management, including EVP Walker; Chief Executive Officer Robert Whitman ("CEO Whitman"); CPO Davis; and Chief Financial Officer Stephen Young ("CFO Young").  (ECF No. 36, ¶¶ 16–17); (ECF No. 43, ¶¶ 16–17).  EVP Walker was ultimately the executive charged with implementing the restructuring.  (ECF No. 37-2, p. 6); (ECF No. 43, ¶ 16).

Pursuant to the restructuring, Defendant consolidated its three sales regions (East, Central, and West) into two sales regions (Pacific and Atlantic).  (ECF No. 36, ¶ 18); (ECF No. 43, ¶ 18).  Prior to consolidating the regions, GM Josie managed the East Region, Mike Heinold managed the Central Region, and General Manager Jennifer Colisomo ("GM Colisomo") managed the West Region.  (ECF No. 36, ¶ 19); (ECF No. 43, ¶ 19).  Going forward, each sales region was organized into pods, which functioned as the primary operating unit of the company.  (ECF No. 37-2, p. 18); (ECF No. 43, ¶ 20).  Although Managing Directors were typically charged with overseeing salespeople, under the new pod structure, Managing Directors were responsible for more revenue and functions because of the transition into a general-manager type role instead of a sales leader

role.  (ECF No. 37-2, p. 8); (ECF No. 43, ¶ 22).  Managing Directors would have more employees reporting to them, including inside business partners, sales assistants, client service coordinators, regional practice leaders, and implementation specialists.  (ECF No. 37-2, pp. 11, 12); (ECF No. 43, ¶ 23).

The restructuring also included the transition of employees into different roles because, according to EVP Walker, some employees then serving as Managing Directors did not have the leadership skills and experience necessary for the restructured role.  (ECF No. 37-2, p. 12); (ECF No. 43, ¶ 25).  EVP Walker, CEO Whitman, GM Colisomo, and GM Josie were responsible for deciding which employees would be affected by the restructuring.  (ECF No. 37-2, p. 14); (ECF No. 43, ¶ 26).  They met to discuss changes to the company's structure in connection with reorganization.  (ECF No. 45, ¶ 28); (ECF No. 52, ¶ 28).  During that meeting, they put together an initial list of individuals—Plaintiff, Andrew Jeppson, Adriana Coury, and Jessica Farnsworth[5]—that would be transitioned in the restructuring, which was subsequently revised and approved of by Defendant's Chairman and HR Department.  (ECF No. 45, ¶ 29); (ECF No. 52, ¶ 29); (ECF No. 48-3, p. 2).  According to GM Josie, each person charged with putting together the list had their own criteria for evaluating employees.  (ECF No. 45, ¶ 34); (ECF No. 52, ¶ 34).  For instance, GM Josie identified a number of criteria that he may have considered, including chemistry, personal situations, capacity to run a large organization, track record with the company, business acumen and educational level, the type of client partners managed, and the ability to work with different clients.  (ECF No. 45, ¶ 35); (ECF No. 52, ¶ 35); (ECF No. 46-9, pp. 9–10).  EVP Walker considered Plaintiff's transition because she had previously been managing a group of

---

[5] Plaintiff avers that Adriana Coury was not of "child-bearing age" in her Concise Statement of Additional Material Facts (ECF No. 45, ¶ 59).  She does not, however, point to any record evidence establishing that Adriana Coury was unable to have children at the time.

junior salespeople, and junior salespeople would be leaving the company as a result of the restructuring.  (ECF No. 37-2, p. 9); (ECF No. 43, ¶ 28).

As part of the restructuring, the company also considered hiring Coral Rice[6] and John Harding as Managing Directors.  (ECF No. 37-2, pp. 10, 12); (ECF No. 43, ¶ 31).  Coral Rice was ultimately hired as a Managing Director while John Harding was not.  (ECF No. 36, ¶ 37); (ECF No. 43, ¶ 37).  CEO Whitman and GM Josie evaluated the remaining Managing Directors serving in the East Region and decided on Andrew Jeppson.  (ECF No. 37-6, p. 3); (ECF No. 43, ¶ 38); (ECF No. 37-3, p. 6); (ECF No. 43, ¶ 38).

Defendant's restructuring was formally announced on March 1, 2017.  (ECF No. 36, ¶ 39); (ECF No. 43, ¶ 39).  The company announced that Plaintiff and Jessica Farnsworth would be transitioned from their Managing Director roles into Client Partner roles (ECF No. 37-2, p. 16); (ECF No. 43, ¶ 40), while Adriana Coury[7] would be made Director of Operations (similar in level to a Managing Director).  (ECF No. 45, ¶ 59); (ECF No. 52, ¶ 59).  Three male Managing Directors were retained.  (ECF No. 45, ¶ 59); (ECF No. 52, ¶ 59).  All of the Client Partners previously working under Plaintiff were transferred to Andrew Jeppson to manage.  (ECF No. 45, ¶ 55); (ECF

---

[6] EVP Walker had been talking to Coral Rice about becoming a Managing Director.  (ECF No. 37-2, p. 10); (ECF No. 43, ¶ 34).  Coral Rice has a master's degree in educational administration and began her employment with Defendant in 1992.  (ECF No.36, ¶¶ 32–33); (ECF No.43, ¶¶ 32–33).  She served in various capacities during her employment with Defendant, including roles as a Client Partner and consultant.  (ECF No.36, ¶ 33); (ECF No.43, ¶ 33).  Coral Rice was an affiliate of Defendant's predecessor, Covey Leadership Center (ECF No. 37-5, p. 4); (ECF No. 43, ¶ 33), previously served as a Client Partner, managed other Client Partners (ECF No. 37-5, p. 5); (ECF No. 43, ¶ 33), and worked as a consultant for Defendant (ECF No. 37-5, p. 7); (ECF No. 43, ¶ 7).  Coral Rice was not of "child-bearing age."  (ECF No. 45, ¶ 60); (ECF No. 52, ¶ 60).

[7] Adriana Coury was not pregnant at the time, and Plaintiff acknowledged that there were other employees affected by the restructuring that were not pregnant.  (ECF No. 36, ¶¶ 42–43); (ECF No. 43, ¶¶ 42–43).

No. 52, ¶ 55).  Mike Heinold was also transitioned from General Manager to Managing Director.

(ECF No. 37-2, p. 17); (ECF No. 43, ¶ 41).

On March 1, 2017, EVP Walker and GM Josie notified Plaintiff by phone that the company

was undergoing restructuring and explained the new pod structure.  (ECF No. 36, ¶ 48); (ECF No.

43, ¶ 48).  EVP Walker informed Plaintiff that they did not see her operating at the new level of

pod leader, but that the company wished to retain her because she was a great contributor.  (ECF

No. 37-2, p. 16); (ECF No. 43, ¶ 49).  Plaintiff was accordingly moved to a Client Partner position,

and she was to report to Coral Rice, who in turn reported to GM Josie.  (ECF No. 45, ¶ 61); (ECF

No. 52, ¶ 61).  Plaintiff was advised that she would no longer be charged with supervising

employees.  (ECF No. 45, ¶ 63); (ECF No. 52, ¶ 63).  EVP Walker informed Plaintiff that she had

the option of covering a large geography, with accounts near her home as well as along the east

coast, including some larger accounts, or covering a territory closer to home.  (ECF No. 37-2, p.

17); (ECF No. 43, ¶ 50).

Bridge compensation was provided to employees affected by the restructuring so that those

individuals could earn the same compensation that they earned in their former role.  (ECF No. 37-

2, p. 17); (ECF No. 43, ¶ 51).  CPO Davis informed Plaintiff via email that she was poised to

receive the same compensation that she received as a Managing Director for the remainder of that

fiscal year, and for the duration of the next fiscal year.  (ECF No. 36, ¶ 55); (ECF No. 43, ¶ 55).

GM Josie and CPO Davis later called Plaintiff to discuss compensation options.  (ECF No. 36, ¶

57); (ECF No. 43, ¶ 57).  GM Josie outlined two compensation plans for Plaintiff during the call:

a no-risk plan and a variable risk plan.  (ECF No. 36, ¶ 59); (ECF No. 43, ¶ 59).  Under the no-

risk plan, Defendant would review Plaintiff's compensation for the past three years and continue

to pay her the highest amount she earned during that period.  (ECF No. 36, ¶ 59); (ECF No. 43, ¶

59).  According to Plaintiff, during that phone discussion, she brought up the eighteen-month bridge compensation plan that CPO Davis discussed via email, and upon doing so, GM Josie immediately conferred with CPO Davis to reduce the bridge compensation to six months.  (ECF No. 46-2, pp. 5, 9).  GM Josie, however, explained that he and Plaintiff could talk about bridge compensation in the next fiscal year, and that he did not want Plaintiff's compensation to be affected.[8]  (ECF No. 37-3, p. 12).  After the conversation, GM Josie sent a follow-up email confirming that bridge pay would be offered for six months.  (ECF No. 46-20, p. 2).  Plaintiff also acknowledged that the compensation of her co-worker did not change even though "he had been given some accounts . . . [that] weren't doing well."  (ECF No. 36, ¶ 72); (ECF No. 43, ¶ 72). Adriana Coury's compensation also remained the same approximately three years after the restructuring, and Rob Ogle's bridge pay just recently ended.  (ECF No. 45, ¶ 111); (ECF No. 52, ¶ 111).

After the move to Client Partner, Plaintiff asserts that she was promised certain accounts by the company.  She believed that the company would be providing her "a list of accounts, and in [her] initial discussions with [EVP] Walker and [GM Josie], they . . . said that [she] would be inheriting accounts from Elise Cannon, Tod Taylor, Andrew Jeppson, and Mike Groll . . . ."  (ECF No. 46-2, p. 8).[9]  Both GM Josie and EVP Walker, however, told Plaintiff that she would only be

---

[8] Plaintiff disputes that GM Josie stated that they could talk about the same arrangement in the next fiscal year but does so by pointing to her own testimony wherein she described how GM Josie conferred with CPO Davis to remove the eighteen-month bridge pay.  (ECF No. 36, ¶ 59); (ECF No. 43, ¶ 59).

[9] *See also* (ECF No. 46-2, p. 31) ("They talked about giving me accounts that were in closer proximity to my home in the New England area, it was Elise Cannon's book of business, and then they also talked about giving me accounts from Mike Groll, Tod Taylor[,] and Andrew Jeppson."); (ECF No. 46-2, p. 32) ("The discussion was about the individuals that I outlined, Cannon, Groll, Jeppson, and Taylor accounts, . . . . The way that that came up was that they said that they felt like I would be a good candidate to take on some of the region's most, you know, important accounts, key accounts . . . .").

receiving some of those accounts.[10]   (ECF No. 52, ¶ 67).   Towards the end of the call, GM Josie told Plaintiff that he would provide her with a written list of accounts and pay plan for her to evaluate the following day.   (ECF No. 45, ¶ 69); (ECF No. 52, ¶ 69).   In a follow-up call, Plaintiff was told that she would not be inheriting Elise Cannon's accounts.   (ECF No. 45, ¶ 75); (ECF No. 52, ¶ 75).   Plaintiff was provided a list of potential accounts that belonged to Tod Taylor, Andrew Jeppson, and Mike Groll, and GM Josie recommended that Plaintiff meet with Andrew Jeppson, Mike Groll, and Tod Taylor to discuss the accounts.   (ECF No. 46-20, pp. 2, 6–9).   According to Plaintiff, she met with those individuals, and Andrew Jeppson told her that GM Josie allowed him to keep his accounts (ECF No. 45, ¶ 80); (ECF No. 52, ¶ 80), while Tod Taylor informed Plaintiff that he had "passed on all but a few accounts."   (ECF No. 48-8, p. 2).   Plaintiff did not inquire into which accounts she would receive upon her return (ECF No. 37-1, p. 24), nor did she know which accounts she would receive upon return.   (ECF No. 37-1, p. 24).   Subsequently, Plaintiff discussed the accounts with GM Josie, and upon doing so, he became angry with her and stated that, regardless of the status of the accounts, "they were what they were, and if [she] didn't like it, [she] could leave."   (ECF No. 46-2, pp. 3, 42).   Plaintiff asked him if the company wanted her to leave, and GM Josie "just paused and . . . told [her] that he would talk to [her] . . . the next week."   (ECF No. 46-2, p. 4).[11]

---

[10] GM Josie stated that the company was "going to look at Mike Groll's [accounts], Tod Taylor's [accounts], Andy Jeppson's [accounts] . . . ."   (ECF No. 37-3, p. 8).   He did not "know if every single account on those lists [was] going to be given to [Plaintiff], but she was going to have a nice book of business . . . ."   (ECF No. 37-3, p. 8).   According to GM Josie, no promises were made as to any accounts and nothing was finalized.   (ECF No. 37-3, p. 9).

[11] GM Josie stated that he could not recall having the conversation and that he did not remember the contents of the conversation.   (ECF No. 53-3, p. 12).   "Testimony that one does not recall certain events is not equivalent to testimony that it did not happen."   *See EEOC v. Bob Evans Farms, LLC*, 725 F. Supp. 3d 635, 642, 642 n.6 (2017) (collecting cases).

On March 16, 2016, Plaintiff's counsel contacted CPO Davis and left a voicemail claiming that Plaintiff was being harassed by an individual in leadership. (ECF No. 45, ¶ 90); (ECF No. 52, ¶ 90).[12]  Plaintiff subsequently took an early maternity leave because her doctors recommended doing so due to stress and complications from her prior pregnancy. (ECF No. 45, ¶¶ 94–95); (ECF No. 52, ¶¶ 94–95).   CPO Davis was charged with handling the investigation into Plaintiff's complaints. (ECF No. 45, ¶ 97); (ECF No. 52, ¶ 97).  Plaintiff's counsel attempted to determine whether Plaintiff could return to work after maternity leave under different leadership, but that was not an option. (ECF No. 45, ¶ 100); (ECF No. 52, ¶ 100).  Plaintiff resigned on June 14, 2017 (ECF No. 37-1, p. 3), approximately three months before her bridge compensation was scheduled to end. (ECF No. 45, ¶ 102); (ECF No. 52, ¶ 102).  In doing so, she acknowledged that upon her return her compensation would have been the same as it was when she left. (ECF No. 36, ¶ 81); (ECF No. 43, ¶ 81).

## III.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).  A fact is material if it must be decided in order to resolve the substantive claim or defense to which the motion is directed.  In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255.  It refrains from making credibility determinations or weighing evidence. *Id.*  "Real questions

---

[12] The parties dispute whether pregnancy discrimination was mentioned. (ECF No. 45, ¶ 90); (ECF No. 52, ¶ 90).  CPO Davis, however, understood that Plaintiff was complaining of pregnancy discrimination. (ECF No. 45, ¶ 91); (ECF No. 52, ¶ 91).

about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV.   ANALYSIS

Defendant requests that the Court grant summary judgment on Plaintiff's hostile work environment, discrimination, and retaliation claims.[13]   Plaintiff's hostile work environment, discrimination, and retaliation claims brought under both Title VII and the PHRA are addressed simultaneously because "[c]laims arising under the PHRA are governed by the same legal standard as that applied to Title VII[,]" *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004),[14] and the parties likewise address each claim under the same legal standards.  After careful consideration of the arguments set forth by the parties, the Court grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claims and constructive discharge claims and denies summary judgment on Plaintiff's discrimination and retaliation claims.

### A.   Hostile Work Environment Claims

Defendant requests that the Court grant summary judgment on Plaintiff's pregnancy-based hostile work environment claims on the ground that Plaintiff cannot establish that she was subject to severe or pervasive discrimination on account of her sex.  (ECF No. 35, pp. 11–15).  Plaintiff

---

[13] Plaintiff has withdrawn her FMLA interference claim.  (ECF No. 42, p. 9 n.2).  That claim is dismissed with prejudice. *See Gyda v. Temple Univ.*, 2000 WL 675722, at *4 (E.D. Pa. May 23, 2000) (dismissing claims with prejudice that were withdrawn on a motion for summary judgment).

[14] *See also Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 318–19 (3d Cir. 2002) (reviewing claims brought pursuant to PHRA and Title VII under same standards); *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) ("PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."); *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir. 1995) (stating PHRA is "construed consistently with interpretations of Title VII."); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791, 791 n.8 (3d Cir. 2016) (same).

counters that Defendant does not properly consider the circumstances in their totality.   (ECF No. 42, 16–18).

To show a *prima facie* case of hostile work environment, a plaintiff must establish that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination suffered was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person under similar circumstances; and (5) the existence of *respondeat superior* liability. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (citation omitted).

To show the conduct at issue is severe or pervasive, the conduct generally must be seen as altering the conditions of employment and creating an abusive working environment. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986).  In other words, conduct is severe or pervasive "when the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment." *Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).  Harassment is measured both objectively and subjectively, *Hatch v. Franklin County*, 755 F. App'x 194, 202 (3d Cir. 2018) (citation omitted), and courts are instructed to consider the totality of the circumstances, including the frequency of the discriminatory conduct, the severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

"The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014).  Title VII is not a general civility code and it does not guarantee an ideal workplace, *Fichter v. AMG Resources Corp.*, 528 F. App'x

225, 231 (3d Cir. 2013), nor does it encompass the ordinary trials and tribulations of the workplace. *Stucke v. City of Philadelphia*, 685 F. App'x 150, 154 (3d Cir. 2017). "Offensive conduct that renders an employee's work[-]life unpleasant or uncomfortable is insufficient." *Williams v. Pa. Human Relations Comm.*, No. 14-1290, 2016 WL 6834612, at *21 (W.D. Pa. Nov. 21, 2016) (citation omitted). Allegations properly described as petty slights, minor annoyances, and simple lack of good manners do not suffice to establish an actionable hostile work environment. *Yarnall v. Phila. School Dist.*, 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

To show that the conduct she endured was sufficiently severe or pervasive, Plaintiff points to a series of events and circumstances that began occurring after her superiors were allegedly aware of her pregnancy. (ECF No. 42, p. 16–18). Those circumstances include: (1) GM Josie stopped scheduling meetings with her (ECF No. 37-1, pp. 13–14); (2) GM Josie let other teams take accounts from her team (ECF No. 37-1, pp. 12–13); (3) GM Josie humiliated her and her team by refusing to provide them gift cards at an award ceremony (ECF No. 46-2, pp. 29–31); (4) GM Josie refused to allow her to hire new members for her team (ECF No. 37-1, p. 13); (5) although GM Josie allegedly promised to "scramble" Plaintiff's team (i.e., switch up members of teams to adjust revenue accrued by each team)—as he allegedly did with other teams—he did not "scramble" her team (ECF No 46-2, pp. 16–17, 22–23); (6) GM Josie and others demoted her; and (7) although GM Josie allegedly promised certain accounts to Plaintiff, he gave many of those accounts to others, and allegedly told Plaintiff to leave if she did not like it (ECF No. 46-2, p. 42).

As an initial matter, Defendant maintains that the Court should not consider acts of discriminatory disparate treatment—namely the demotion—in adjudicating a hostile work environment claim. (ECF No. 51, p. 8). This argument is premised on a body of law distinguishing

otherwise individual acts of disparate treatment from hostile work environments.  Our Court of

Appeals, however, has not adopted or had the occasion to address the doctrine.  The Court agrees

that consideration of Plaintiff's demotion in analyzing her hostile work environment claim is

inappropriate because it would "blur the distinctions between . . . the elements that underpin each

cause of action and the kinds of harm each cause of action was designed to address."[15]  *Lampkins*

*v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 329 (D. Del. 2019).  Plaintiff's demotion is properly

considered an individual act of disparate treatment because it is a tangible adverse employment

action.  The same is also true of Plaintiff's allegation that GM Josie allegedly gave away promised

accounts, resulting in a reduction in her compensation.[16]  *See Griffin v. Dep't of Human Services*,

---

[15] *See Helvy v. Allegheny Cty.*, No. 14-01686, 2015 WL 672262, at *3 (W.D. Pa. Feb. 17, 2015) (declining to consider individual acts of disparate treatment in analyzing hostile work environment because a plaintiff is not permitted to "cobble together a number of distinct, disparate acts—the same acts that make up her disparate treatment claim—and label it a hostile work environment."); *Busch v. Oswayo Valley School Dist.*, No. 15-239, 2016 WL 5394085, at *9 (W.D. Pa. 2016) (same); *Stucke v. City of Phila.*, No. 12-6216, 2015 WL 2231849, at *7 (E.D. Pa. May 12, 2015) (same); *Parker v. State Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 475–77 (D. Del. 1998) (same). *See also Haqq v. Pa. Dept. of Public Welfare*, No. 09-0042, 2010 WL 1253452, at *9 n.9 (E.D. Pa. Mar. 23, 2010) (noting that the concerns of district courts regarding allowing individual acts of disparate treatment to form the basis of a hostile work environment are well-reasoned). *Cf. Quick v. GEO Group, Inc.*, No. 18-93, 2020 WL 532343, at *14 (W.D. Pa. Feb. 3, 2020) (discussing the doctrine and distinguishing *Helvy* and *Lampkins* on the grounds that the plaintiff did not bring a disparate treatment claim).

[16] Indeed, Plaintiff acknowledges that this circumstance is an individual act of disparate treatment. *See* (ECF No. 42, p. 14) (discussing Defendant's reason for discrimination does not explain "Josie's post-March 1, 2017 acts stripping [Plaintiff] of assigned accounts . . . . As [Defendant] has offered no reason for that disparate treatment . . . ."). Moreover, the record does not support that Plaintiff was promised certain accounts by GM Josie, nor can it reasonably be inferred that she was promised certain accounts upon her return from maternity leave. The statements of GM Josie (ECF No. 36, ¶ 59); (ECF No. 36, ¶ 68); (ECF No. 43, ¶ 59), CPO Davis (ECF No. 46-19), and EVP Walker (ECF No. 36, ¶ 51); (ECF No. 43, ¶ 51), and Plaintiff illustrate nothing more than preliminary negotiations concerning the scope of Plaintiff's responsibility upon her return. Furthermore, to the extent that Plaintiff is using the alleged promise of accounts to show a reduction in her compensation, her contention is highly speculative. Although there is some dispute of the duration of bridge compensation, the fact remains that Plaintiff received bridge compensation during her maternity leave (ECF No. 36, ¶ 78); (ECF No. 43, ¶ 78), and she acknowledged that, upon her return, her compensation would have been exactly the same as it was

No. 18-14697, 2019 WL 3369783, at *3 (D.N.J. Jul. 26, 2019) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)) ("Demotions, reductions in pay, failures to promote, office moves to undesirable locations, undesirable assignments, transfers to dead-end jobs, transfers with reduction in pay, and compensation decisions are all discrete acts."). These circumstances are appropriately analyzed as separate instances of discrimination, and the Court therefore will not consider her demotion or reduction in compensation in adjudicating her hostile work environment claim.

Plaintiff's remaining circumstances (i.e., GM Josie cancelling meetings, allowing other teams to take accounts, refusing gift cards, freezing hiring, failing to "scramble," and telling Plaintiff to leave during a conversation), while they may have created a contentious working environment, are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive because they consist of isolated and otherwise neutral managerial functions, which amount to no more than "petty slights, minor annoyances, and simple lack of good manners." *Yarnall*, 57 F. Supp. 3d at 433 (quoting *Burlington*, 548 U.S. at 68) (internal quotation marks omitted). *See Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006), *overruled in part on other grounds, Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (discussing how "[a] cold shoulder can be hurtful, but it is not harassment."); *Williams v. Pa. Human Relations*

---

when she left.  (ECF No. 36, ¶ 81); (ECF No. 43, ¶ 81).  Plaintiff resigned approximately three months before her bridge compensation was allegedly going to terminate.  The testimony of other employees on bridge compensation does not bolster her cause because Adriana Coury's compensation remained the same approximately three years after the restructuring, and Rob Ogle's bridge pay just recently ended.  (ECF No. 45, ¶ 111); (ECF No. 52, ¶ 111).  On the same note, GM Josie, EVP Walker, and CPO Davis indicated that they intended for Plaintiff to receive bridge pay for as long as necessary.  The record, therefore, does not support Plaintiff's allegation that GM Josie promised any accounts to her—by all measures, it appears that the conversations between Plaintiff and GM Josie were at most preliminary discussions for the future—and any resulting reduction in pay does not extend beyond speculation.

*Comm.*, No. 14-1290, 2016 WL 6834612, at *20 (W.D. Pa. Nov. 21, 2016) (discussing that the perceived discourtesy or bad manners of a superior is insufficient to show harassment); *Baugh v. Robert Morris Univ.*, No. 16-430, 2018 WL 1400063, at *24 (W.D. Pa. Mar. 20, 2018) (collecting cases discussing pervasiveness).

Because it would be improper for the Court to consider Plaintiff's demotion and reduction in pay in its analysis of her hostile work environment claims, and because the remaining circumstances, considered in their totality, are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive, the Court grants summary judgment on Plaintiff's hostile work environment claims.

### B.    Discrimination Claims

Defendant next contends that Plaintiff cannot establish *prima facie* cases of discrimination on the basis of sex, either pursuant to her gender or pregnancy, because Plaintiff did not experience an adverse employment action, and even if she did, the evidence does not support an inference of gender or pregnancy discrimination.  (ECF No. 35, p. 15).

A *prima facie* case of pregnancy discrimination requires a showing of the following: "(1) the employer had knowledge of the pregnancy; (2) the plaintiff was qualified for the job; (3) the plaintiff suffered an adverse employment action; and (4) there is a nexus between the plaintiff's pregnancy and the adverse employment action that raises an inference of discrimination." *Fritz v. Uwchlan Ambulance Corps, Inc.*, No. 18-3181, 2020 WL 1042420, at *3 (E.D. Pa. Mar. 4, 2020) (citation omitted).   A *prima facie* case of gender discrimination requires a showing of the following: "(1) she was a member of a protected class; (2) . . . she was qualified for the position; (3) . . . she suffered an adverse employment action; and (4) the adverse employment action

occurred under circumstances that give rise to an inference of discrimination." *Id.* (citation omitted).

"Disparate treatment discrimination is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). If indirect evidence is the chosen avenue, the burden-shifting framework is applied. *Id. See also Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 553 (W.D. Pa. 2019) (applying burden shifting framework to sex discrimination claims); *Fritz*, 2020 WL 1042420, at *3 (applying burden shifting framework to pregnancy discrimination claims). The employee must first establish a *prima facie* case. If she does so, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its adverse employment decision. If the employer does so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination. *Doe*, 527 F.3d at 364.

Defendant first argues that Plaintiff has failed to show that she was subject to an adverse employment action. (ECF No. 35, 16–19). An adverse employment action is one that brings about serious and tangible consequences resulting in the alteration of an employee's compensation, terms, conditions, or privileges of employment. *Fritz*, 2020 WL 1042420, at *4 (citation omitted). Modest changes in the duties or conditions of employment that do not result in a material disadvantage are not properly considered adverse. *Id.* (citation omitted). Typical examples of adverse employment actions include, *inter alia*, hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Id.* (citation omitted). Plaintiff contends that there were three adverse employment actions: (1) her

demotion (ECF No. 42, 9–10); (2) the stripping away of accounts (ECF No. 42, pp. 14, 20 n.12); and (3) her constructive discharge (ECF No. 42, p. 11).

The Court finds that Plaintiff cannot show that she was constructively discharged, nor could a factfinder reasonably conclude that she was constructively discharged because she failed to demonstrate that she was subjected to a hostile work environment. *See Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 174 n.7 (3d Cir. 2014) (finding no constructive discharge where plaintiff failed to establish a hostile work environment). Additionally, although Plaintiff argues that she suffered an adverse employment action when GM Josie allegedly gave away promised accounts (ECF No. 42, pp. 14, 20 n.12), a factfinder could not reasonably find that this is an adverse employment action because, for the same reasons set forth *supra* at pages 15–16 n.16, the record does not show that she was ever promised accounts. The record merely shows that she and others were engaged in preliminary negotiations, and similarly, that she received, and would continue to receive, the same compensation during and after her maternity leave.

The Court grants summary judgment on Plaintiff's constructive discharge claims because she failed to establish her hostile work environment claims. The Court also grants summary judgment on Plaintiff's circumstance involving the promise of certain accounts because no factfinder could reasonably conclude that she was promised accounts, nor could a factfinder reasonably conclude that she received a reduction in pay.

Plaintiff's demotion, however, is an adverse employment action. "Employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff's *prima facie* case." *Jones v. School Dist. Of Phila.*, 198 F.3d 403, 411–12 (3d Cir. 1999) (citing *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994)). *See also Torre*, 42 F.3d at 831 n.7 ("It is clear . . . that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an

adverse job action."). She was recruited as a Managing Director, a role that required her to coach Client Partners, assist them with learning content, hold them accountable to sales goals, attend client visits with them, and create strategy for developing accounts. (ECF No. 36, ¶ 7); (ECF No. 43, ¶ 7). Her transfer to Client Partner meant that she would no longer be charged with supervising Client Partners, and as a result, regardless of the parties' characterizations, Plaintiff was demoted to a lower-level position with less responsibility, a move that a factfinder could reasonably conclude was an adverse employment action.

Plaintiff's demotion was also accompanied by circumstances from which a factfinder could reasonably find that she was demoted because of her pregnancy or sex. Typically, to show an inference of discrimination, a plaintiff points to others outside of her protected class who were treated more favorably than her. *Parish v. UPMC University Health Center of Pittsburgh*, 373 F. Supp. 3d 608, 628–30 (W.D. Pa. 2019). In cases involving a reduction in force, however, the standard is more relaxed. *Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 553–55 (W.D. Pa. 2019). A plaintiff in a reduction-in-force case need only show that the company retained employees outside of her protected class. *Id.* (citation omitted).

Plaintiff has shown the required inference because Defendant retained employees outside of Plaintiff's protected class, and her demotion was preceded by several aggravating circumstances used to describe her hostile work environment claims. As a result, viewing the circumstances in the light most favorable to Plaintiff, a factfinder could reasonably find that she was discriminated against because of her sex or pregnancy.

Because Plaintiff has established a *prima facie* case of discrimination concerning her demotion, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Sabo*, 386 F. Supp. 3d at 554. Defendant contends that Plaintiff's

demotion was the result of a nationwide restructuring of the company's sales business (ECF No. 35, p. 24), and the burden therefore shifts back to Plaintiff to establish pretext. *Sabo*, 386 F. Supp. 3d at 546. There are two methods that can be employed by a plaintiff to show that a defendant's reason for the discrimination is pretextual. *Sabo*, 386 F. Supp. 3d at 546. First, a plaintiff can produce evidence showing that the proffered reason is so weak that it is "unworthy of credence." *Id.* (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647–48 (3d Cir. 2015)). Second, a plaintiff can produce evidence of pretext by pointing to any of the following: "(1) that defendant previously discriminated against the plaintiff; (2) that defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated individuals outside the protected class more favorably." *Id.* (citation omitted).

During the restructuring, Defendant hired Coral Rice as a Managing Director, transitioned Jessica Farnsworth into a Director of Operations, and demoted Adriana Coury into a Client Partner role. Defendant also retained Andrew Jeppson, Mike Groll, and Tod Taylor in Managing Director roles. The circumstances are accompanied by the aggravating conduct of GM Josie after he learned of Plaintiff's pregnancy and planned leave. Viewing these circumstances aggregately in the light most favorable to Plaintiff, and drawing all reasonable inferences therefrom, a factfinder could reasonably find that the national restructuring of Defendant's business was used as a pretext to conceal its actionable conduct related to Plaintiff's demotion. These circumstances that occurred during and prior to the demotion amount to a close call—one that should be resolved by the factfinder at trial.

Therefore, the Court denies summary judgment on Plaintiff's demotion-based discrimination claims because she has established *prima facie* cases of discrimination under Title VII and the PHRA, and a factfinder could reasonably find that the sex and pregnancy

discrimination suffered by Plaintiff was obscured under the veil of Defendant's national restructuring.

### C.   Retaliation Claims

Defendant contends that Plaintiff has not established *prima facie* cases of Title VII/PHRA retaliation because she cannot show: (1) that she suffered an adverse employment action, (2) that she engaged in protected activity, or (3) causation.[17]   (ECF No. 35, pp. 21–24).   Defendant also contends that Plaintiff cannot establish a *prima facie* case of FMLA retaliation because she cannot show an adverse employment action or causation.   (ECF No. 35, p. 28).

To establish *prima facie* cases of retaliation under Title VII and the PHRA, a plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Sabo*, 386 F. Supp. 3d at 555.   To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 301–02 (3d Cir. 2012).   Where a plaintiff proceeds on indirect evidence, the *McDonnell Douglas* burden-shifting framework applies to each of these claims. *See id.* at 302 (stating framework applies in FMLA retaliation cases supported by

---

[17] Plaintiff ambiguously argues that because CPO Davis "admitted that it was [Plaintiff's] assertion of her rights through counsel that deterred [Defendant] from taking any action to remedy the discrimination[,]" Defendant is liable for retaliation.   (ECF No. 42, p. 20).   To the extent Plaintiff claims that GM Josie retaliated after her counsel complained on her behalf by removing accounts from her (ECF No. 20, p. 20, n.12), that is not an actionable retaliation claim because "failing to remedy discrimination" is not an adverse employment action, *Ashton v. SCI-Fayette, Pa. Dept. of Corrections*, No. 16-1795, 2018 WL 2966849 (W.D. Pa. Jun. 13, 2018), nor for the reasons already stated, does the record establish that Plaintiff was promised certain accounts.

indirect evidence); *Carvalho-Grevious, v. Delaware State University*, 851 F.3d 249, 257 (3d Cir. 2017) (applying *McDonnell Douglas* burden-shifting framework to Title VII retaliation case).

To show protected activity, a plaintiff can point to informal protests of discriminatory employment practices, which include complaints made to upper management. *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) (citation omitted). The message rather than the means of conveyance is crucial to a finding of protected activity. *Id.* (citation omitted). To that extent, protected activity occurs where a plaintiff complains to management about alleged discrimination in a manner where it is possible to discern from the context of the statement that the employee is opposing unlawful conduct. *Sabo*, 386 F. Supp. 3d at 555.

To show causation, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). A plaintiff may point to a broad array of evidence to establish causation, including inconsistent explanations, patterns of antagonism, or temporal proximity suggestive of retaliatory motive. *Carvalho-Grevious*, 851 F.3d at 260. The overall inquiry is focused on the totality of the circumstances, which tends to show the required inference. *Id.*

For the reasons already set forth *supra* at pages 19–20, Plaintiff suffered an adverse employment action when she was demoted. She also engaged in protected activities by phoning CPO Davis to discuss GM Josie's treatment of her,[18] and by notifying GM Josie of her planned

---

[18] Plaintiff points out that during a phone conversation with CPO Davis, she conveyed that "[she] felt very uncomfortable with the hiring strategy being put on hold because of [her] pregnancy." (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90). On the same call, Plaintiff went on to identify the instance in which GM Josie refused to provide her team with gift cards, and she further noted that she was "getting scared" because GM Josie "was starting to ignore [her] emails and cancel [her] one-on-ones." (ECF No. 36, ¶ 90); (ECF No. 43, ¶ 90).

leave.  Moreover, she has sufficiently shown causation because, as both parties acknowledge, the decision to move Plaintiff was made by consensus of the leadership group, including CPO Davis, EVP Walker, GM Josie and CEO Whitman (ECF No. 45, ¶ 42); (ECF No. 52, ¶ 42); *see also* (ECF No. 36, ¶ 17); (ECF No. 43, ¶ 17) (stating that EVP Walker, CEO Whitman, CPO Davis, and CFO Young were involved in discussions about restructuring).  And as both CPO Davis and GM Josie were each aware of protected activity—and were charged to some extent with Plaintiff's move from Managing Director to Client Partner—a factfinder could reasonably find that her demotion is causally connected to her protected activities.  That causal connection is further strengthened by the presence of the aggravating circumstances endured by Plaintiff after she notified GM Josie of her planned leave.

Because Plaintiff has established *prima facie* cases of retaliation concerning her demotion, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Defendant again contends that Plaintiff's demotion was the result of a nationwide restructuring of the company's sales business (ECF No. 35, p. 24), and the burden therefore shifts back to Plaintiff to establish pretext.

To show that a legitimate, non-discriminatory reason is pretextual, a plaintiff must point to evidence from which a factfinder could reasonably disbelieve the reason or believe that an invidious discriminatory reason was more likely than not the motivating cause of the action. *Michniewicz v. Metasource, LLC*, 756 F. Supp. 2d 657, 668 (E.D. Pa. 2010) (citation omitted).  A plaintiff usually does so by: "(1) discredit[ing] [the defendant's] reason, by coming forward with such weaknesses, implausibilities, incoherencies, inconsistencies, or contradictions in the proffered reason to allow a rational factfinder to find the reason unworthy of credence, or (2)

adduc[ing] evidence that discrimination was more likely than not a motivating or determinative cause." *Id.* (citation omitted).

For the reasons set forth *supra* at pages 21–22, whether the circumstances surrounding Defendant's national restructuring were used to hide what was, in fact, retaliation is a decision best resolved by the factfinder. Therefore, the Court denies summary judgment on Plaintiff's retaliation claims brought under Title VII, the PHRA, and the FMLA because she established *prima facie* cases of retaliation, and a factfinder could reasonably find that the reason offered by Defendant for her demotion was pretextual.

## V.   CONCLUSION

For the reasons set forth herein, the Court grants in part and denies in part Defendant's Motion for Summary Judgment (ECF No. 34). The Court grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claims brought under Title VII and the PHRA, and included at Counts I and II of the Complaint because, without considering Plaintiff's demotion, the totality of the circumstances endured by Plaintiff are insufficient to allow a factfinder to reasonably conclude that the conduct at issue was either severe or pervasive. The Court grants summary judgment in favor of Defendant on Plaintiff's constructive discharge claims brought under Title VII and the PHRA, and included at Counts I and II of the Complaint because Plaintiff failed to establish the lesser severity or pervasiveness required for hostile work environment claims, and as a result, no factfinder could reasonably conclude that Plaintiff was constructively discharged. The Court also grants summary judgment in favor of Defendant on Plaintiff's discrimination claims involving the alleged promise of certain accounts brought under Title VII and the PHRA, and included at Counts I and II because the record does not reflect that she was promised accounts, nor could the same be considered an adverse employment action.

The Court denies summary judgment on Plaintiff's demotion-based discrimination claims brought under Title VII and the PHRA, and included at Counts I and II because she has sufficiently established *prima facie* cases of discrimination, and although Defendant has offered its national restructuring as a legitimate, non-discriminatory reason for her demotion, she has provided circumstances that would allow a factfinder to reasonably conclude that the proffered reason was pretextual. The Court also denies summary judgment on Plaintiff's demotion-based retaliation claims brought under Title VII, the PHRA, and the FMLA, and included at Counts I, II, and III because she established *prima facie* cases of retaliation, and because Defendant proffered the same legitimate, non-discriminatory reason above, a factfinder could reasonably find that the proffered reason was pretextual. These claims will proceed to trial. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

February 9, 2021
Dated